MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:        2025 ME 59
Decision:        Cum-24-394
Argued:          April 8, 2025
Decided:         July 3, 2025

Panel:           STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

SHARON ANDERSEN

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

HORTON, J.

[¶1]  Sharon Andersen appeals from a summary judgment of the Superior Court (Cumberland County, *Cashman, J.*) entered in favor of the Department of Health and Human Services on her complaint alleging hostile-work-environment disability discrimination under the Maine Human Rights Act (MHRA), *see* 5 M.R.S. § 4572(1) (2025).  The court concluded that Andersen's claim was time-barred because the only actions of the Department that were within the statutory limitations period were neither discriminatory in themselves nor indicative of a continuing violation, as defined in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-22 (2002).  On appeal, the issue is whether Andersen made a prima facie showing of a continuing violation.  We conclude that she did not and affirm the judgment.

## I. BACKGROUND

[¶2] "The following facts are drawn from the parties' supported statements of material facts and are presented in the light most favorable to [Andersen] as the party against whom summary judgment was entered." *Adeyanju v. Foot & Ankle Assocs. of Me., P.A.*, 2024 ME 64, ¶ 2, 322 A.3d 1201. Although the Department disputes some of Andersen's allegations, especially those regarding statements allegedly made by her supervisor, the following factual recitation is supported by evidence in the record that would be admissible at trial, *see HSBC Mortg. Servs., Inc. v. Murphy*, 2011 ME 59, ¶ 9, 19 A.3d 815.

### A. Events Leading to Andersen's Leave of Absence

[¶3] Andersen was employed by the Department from 2005 to 2019. The events relevant to her claim occurred from July 2018 to August 2019. As of the summer of 2018, Andersen was a Case Aide II in the Department's Office of Child and Family Services (OCFS). She was supervised by an Adoption Supervisor, who in turn reported to the OCFS administrators.

[¶4] During the summer of 2018, Andersen was working in the Department's Portland office and struggled to keep up with her workload. She also began having tense interactions with her supervisor after she mistakenly

emailed confidential case information to foster parents and families who were not authorized to receive the information. When interviewed later about the mistake, Andersen said that she was "overwhelmed" with legal work in her job and that she sometimes left work in tears. On August 28, Andersen texted her supervisor, "I need to talk to you; I am so stressed and upset about my job." To keep up with her work, Andersen skipped a work-related outing and reported to her supervisor that she felt stressed as a result. On November 2, after examining Andersen's timecard, the supervisor instructed Andersen in an email to avoid working overtime or taking additional flex time without permission, to contact the supervisor upon arriving at work, and to give advance notice of her vacation plans.

[¶5] During a meeting with her supervisor on November 5, Andersen said that she was feeling increased stress and anxiety and experiencing panic attacks, and that she needed to schedule medical appointments to obtain treatment. The supervisor told an OCFS administrator that Andersen had reported having panic attacks, and the administrator sent an e-mail to a human resources manager that included the following:

> Can you get back to us about this—[Andersen] had said in our
> meeting that her anxiety and stress were so high given this job that
> she had to see doctors and tests were run—thinking that she needs

to fill [workers' compensation documents] out but it does not appear that she wants to—can you give us some direction?

The manager directed Andersen's supervisor to complete a first report of injury to initiate a workers' compensation claim for Andersen. In the report, the supervisor wrote, "[Andersen] has issues with anxiety and low blood sugar which is exacerbated by stress and led her to mistake these symptoms for [a] possible heart issue." The injury report was referred to the Department's human resources office, which denied the claim.

[¶6] After the November 5 meeting, Andersen requested a state-owned car to use for work-related travel while her car was under repair. The OCFS administrators told Andersen that she would need to rent a car and could be fired if she did not have access to a car. Separately, at an OCFS supervisors' meeting held on November 8, Andersen's supervisor stated that "[Andersen] takes up half of [the supervisor's] day and is constantly lying and not working."

[¶7] On December 5, Andersen's supervisor gave her a written warning for failing to follow a directive, misrepresenting facts, and abusing flex time. Andersen denied the allegations. On December 11, when Andersen and her supervisor met to discuss the warning, the supervisor accused Andersen of having something wrong with her brain, being a "sneaky liar," and being too stupid to use a GPS when transporting children as part of her work

responsibilities. On December 14, the OCFS issued Andersen a five-day suspension for her mistake in sending the confidential email message to unauthorized recipients in August. The suspension was later reduced to two days because "Andersen [had] been an OCFS employee for 13 years with no record of discipline until recently."[1]

[¶8] On December 19, Andersen missed work due to chest pain. The same day, an OCFS administrator directed Andersen in an email not to work through lunch, to avoid misusing flex time, to inform her supervisor upon arriving at work, and to obtain permission for appointments and vacations. Andersen responded, "I am not even sure why I am getting this email again. I feel I do follow all the [above] and I feel as though I am being targeted."

[¶9] On or about January 11, 2019, Andersen's supervisor issued her a written reprimand, alleging that she failed to enter time accurately, failed to obtain approval or give advance notice of absences, and failed to manage medical records properly. The reprimand stated that Andersen did not comply with the November 2 and December 19 emails but did not identify specific instances of noncompliance. The OCFS administrators later questioned Andersen about her management of medical record requests, leading Andersen

---

[1] Due to her subsequent medical leave of absence, *see infra*, Andersen never served any of the reduced suspension.

to write, "I feel my supervisor should/could have addressed this with me and not [the administrators].  I feel this is just another form of attack on me."

[¶10]  On January 17, Andersen's supervisor held another disciplinary meeting with her.  Before the meeting, the union steward told a union representative that the repeated reprimands of Andersen seemed to constitute harassment.  At the meeting, Andersen's supervisor yelled at her and said, as she had during the December 11 meeting, that Andersen had something wrong with her brain and was too stupid to use a GPS.  Andersen appeared to experience an anxiety attack and left the room.  The supervisor later expressed concern and said to Andersen, "You know I did not want to do this to you[.]  I was told to squeeze you."

[¶11]  On January 18, Andersen worked alone and cried several times.  At the direction of her physician, Andersen went on medical leave the next day.

## B.    Events During Andersen's Leave of Absence

[¶12]  On January 30, 2019, Andersen began counseling with a licensed therapist and was diagnosed with post-traumatic stress disorder (PTSD). Upon learning in April that Andersen was unready to return to work, the Department's human resources office prompted her to request additional medical leave.  Accordingly, Andersen submitted a request for a reasonable

accommodation under the Americans with Disabilities Act (ADA) and the MHRA. In her request, she explained, "I am asking to stay on medical leave, so that I can continue to get the help I need" because "OCFS is not a good place for me." She further stated that she suffered from anxiety attacks and was being treated for major depressive disorder.[2] She wrote that she was unable to perform her duties at work because any work-related stress would trigger her anxiety attacks, chest pain, and shortness of breath, adding that "OCFS is a very hostile environment to work in."

[¶13] In late April and early May 2019, Andersen spoke on multiple occasions with the human resources representative assigned to investigate her complaint of a hostile work environment at OCFS. On one occasion, Andersen explained her anxiety, said that she could no longer work with her supervisor, and mentioned overhearing her supervisor admit to the union steward that the supervisor's actions toward Andersen were wrongful. In a subsequent interaction, Andersen stated that she wanted to be reassigned to the Department's Biddeford office or a different Department division in Portland. Other than the human resource representative's outreach, the Department did

---

[2] Andersen's physician confirmed to the Department she was being treated for major depressive disorder. When the Department asked whether there was a reasonable accommodation that would enable Andersen to return to work, the physician responded, "She cannot work."

not respond to Andersen's request for a reasonable accommodation, and Andersen remained on leave. Andersen's physician predicted that Andersen could return to work in June but that a reassignment might be necessary.

[¶14] In June 2019, Andersen submitted a second request for a reasonable accommodation. In the request, Andersen again highlighted her anxiety attacks, which she attributed to "the work/[b]ullying," and her major depressive disorder diagnosis. Andersen's requested accommodation was a "change in Department/Building" so that she would no longer be supervised by her supervisor. In support of her request, Andersen wrote, "There has been nothing done concerning my complaint on the [b]ullying and retaliation that was done to me. I cannot work in [the OCFS] knowing that it will happen again." At the Department's request for an update on Andersen's health status from her physician, the physician again substantiated Andersen's health concerns.[3]

[¶15] On July 24, 2019, Andersen sent an email message to the Department's equal employment opportunity coordinator requesting an update on her request for a reasonable accommodation. The coordinator replied the same day, stating that Andersen was "on unpaid health leave" and

---

[3] The physician noted that Andersen's major depressive disorder and anxiety attacks inhibited her breathing, concentrating, working, sleeping, eating, and interpersonal interactions. He added that Andersen could not perform her job functions because the "environment at work is increasing [Andersen's] anxiety" and that "severe anxiety and panic attacks prevent[] her from working."

that reassignment to a different position or location was unwarranted because Andersen could "perform the essential functions of [her] job" and reassignment would be proper only if no other accommodation would enable her to perform her essential job functions. In early August, the coordinator reiterated that Andersen was ineligible for reassignment. Andersen's therapist wrote to the Department that Andersen's need for a new work environment was due to her PTSD diagnosis. However, the coordinator still declined to grant Andersen's request for a reasonable accommodation, explaining that reassignment "is not an accommodation under the ADA" and adding that she had been informed that the alleged harassment of Andersen did not happen.

[¶16] On August 30, 2019, Andersen resigned by sending an email message to the coordinator that asserted that her resignation constituted a constructive discharge.

## C. Disability Discrimination Complaint

[¶17] Andersen filed a discrimination complaint with the Maine Human Rights Commission (MHRC) and received a "right-to-sue" letter from the MHRC on August 19, 2020. On August 18, 2021, nearly two years after she resigned, Andersen filed a four-count complaint against the Department in the Superior Court. The first three counts asserted MHRA claims for disability

discrimination, failure to accommodate, and retaliation, and the fourth count asserted a common law claim for slander. After the Department filed a motion to dismiss, the court (*Warren, J.*) dismissed the slander claim and granted Andersen leave to amend her complaint. She amended the complaint to assert the same three MHRA counts, and the Department filed another motion to dismiss. The court dismissed without objection the count of failure to accommodate because "Andersen [was] no longer pursuing a claim that [the Department] failed to provide her with a reasonable accommodation." The court also dismissed the retaliation count, but it denied the Department's motion as to the disability discrimination count. The material allegations within that count were that the Department "had notice of [Andersen's] disabilities . . . [and] discriminated against [her] by refusing to accommodate her and terminating her employment because of her disability." The Department's answer to the amended complaint acknowledged that Andersen's "depression and PTSD qualify [as] a disability as defined by the MHRA" but denied that the Department had notice of the disabilities or discriminated based on the disabilities. Mediation was unsuccessful in resolving the case.

[¶18]   The Department filed a motion for summary judgment and Andersen filed an opposition.  The court (*Cashman, J.*) granted the Department summary judgment in August 2024.   Applying the two-year statute of limitations for MHRA claims, 5 M.R.S. §§ 4613(2)(C), 4622(1) (2025), the court reasoned that the only relevant events within the two years before Andersen filed her complaint were "the Department's continuing refusal to reassign Andersen as a disability accommodation and Andersen's resignation."   The court determined that neither event, viewed in the light most favorable to Andersen, was an actionable act of discrimination on its own, because (1) reassignment to a new supervisor was not a required reasonable accommodation and (2) Andersen's resignation was brought about by "other facts . . . either outside the statute of limitations period or . . . [that were] not unlawful."[4]  The court further determined that Andersen failed to make a prima facie showing that either event was part of a "continuing violation," because neither could reasonably be deemed a continuation of the pattern of

---

[4] On appeal, Andersen has not argued that events in the two-year limitations period constituted discrete adverse acts of discrimination.  Instead, her theory on appeal is that she was subjected to a hostile work environment.  *See infra* ¶¶ 22-24.  Separately, we note that the court's determination that reassignment was not a reasonable accommodation relied on ADA jurisprudence because of its relevance to interpreting the MHRA.  *See Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 20 n.3, 168 A.3d 768.

harassment and bullying that Andersen had alleged. *See Randall v. Potter*, 366 F. Supp. 2d 104, 115-16 (D. Me. 2005).

[¶19]  Andersen timely appealed from the judgment. *See* 14 M.R.S. § 1851 (2025); M.R. App. P. 2B(c)(1).

## II.  DISCUSSION

[¶20]  Although the parties have briefed the substantive validity of Andersen's claim, we need reach the merits only if we decide, contrary to the court's ruling, that Andersen's disability discrimination claim was timely under the MHRA's statute of limitations provisions, 5 M.R.S. §§ 4613(2)(C), 4622(1).[5] As it has regularly, our interpretation of the MHRA here draws upon federal court decisions under the counterpart federal statutes. *Winston v. Me. Tech. Coll. Sys.*, 631 A.2d 70, 74 (Me. 1993) ("[B]ecause the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA.").

---

[5]  Andersen's briefing focuses on the merits of her disability discrimination claim and discusses the timeliness issue only in passing, thereby raising a question of whether she has waived her right to challenge the court's ruling on this issue. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quotation marks omitted)).  Nevertheless, we review the issue on its merits because Andersen does argue that, because she was constructively discharged, her disability-related hostile-work-environment claim was timely.

## A.     Standard of Review

[¶21]  "Whether a claim is barred by the statute of limitations is a legal question subject to de novo review.  We strictly construe statutes of limitations."  *In re Est. of Gray*, 2014 ME 119, ¶ 8, 103 A.3d 212 (citation and quotation marks omitted).  "To survive a limitations defense raised at summary judgment . . . a plaintiff . . . bears the burden of demonstrating that the summary judgment record generates a factual dispute about the running of the limitations period."  *Drilling & Blasting Rock Specialists, Inc. v. Rheaume*, 2016 ME 131, ¶ 15, 147 A.3d 824.

## B.     Background on MHRA Disability Discrimination Claims

[¶22]  Andersen's disability discrimination claim relies on the following language of the MHRA:

> **1.  Unlawful employment discrimination.**  It is unlawful employment discrimination, in violation of this Act, except when based on a bona fide occupation qualification:
>
> > **A.**  For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, sexual orientation or gender identity, physical or mental disability, religion, age, ancestry, national origin or familial status . . . or, because of those reasons, to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment . . . .

5 M.R.S. § 4572(1). A plaintiff may pursue MHRA disability discrimination claims by alleging an adverse employment action, requiring the plaintiff to show that "first, she suffers from a disability; second, she is otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job; and third, she was adversely treated by the employer based in whole or in part on her disability." *Doyle v. Dep't of Hum. Serv's*, 2003 ME 61, ¶ 14, 824 A.2d 48. Alternatively, a plaintiff can proceed under a "hostile work environment" theory, a concept that originates from federal employment discrimination cases involving sexual harassment that have been brought under Title VII of the Civil Rights Act. *See Watt v. Unifirst Corp.*, 2009 ME 47, ¶ 22, 969 A.2d 897; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986). Whereas a claim of an adverse employment action requires proof of a triggering event such as demotion or termination, a claim of a hostile work environment requires proof of "repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment." *Doyle*, 2003 ME 61, ¶¶ 14-18, 23, 824 A.2d 48. While many claims of a hostile work environment "involve a pattern of inappropriate conduct," a single instance of harassment may give rise to such a claim in rare cases. *See Nadeau*

*v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976-77 (Me. 1996) (involving a sex-for-money proposal by the employer).

[¶23]  Claims of a hostile work environment frequently rest on allegations of sexual harassment in the workplace. *See, e.g.*, *id.*; *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001).  We have not previously considered disability-related claims of a hostile work environment under the MHRA, but federal courts have drawn upon Title VII jurisprudence in deciding claims of a hostile work environment under the ADA.  *See Stratton v. Bentley Univ.*, 113 F.4th 25, 50-51 (1st Cir. 2024); *Fitzpatrick v. Town of Falmouth*, 2005 ME 97, ¶ 28, 879 A.2d 21 ("Because of the similarity between the MHRA and the [ADA], we utilize federal cases interpreting the ADA when we interpret comparable provisions in the MHRA." (citation omitted)).

[¶24]  On appeal, Andersen frames her disability discrimination claim in terms of a hostile work environment rather than an adverse action, and the Department does not challenge her characterization of her claim.[6]  We

---

[6]  Andersen took a different approach in the trial court.  When the trial court denied the Department's motion to dismiss the disability discrimination count in Andersen's amended complaint, the court characterized Andersen's cause of action as based on a "hostile environment" rather than any specific adverse action.  Yet, Andersen's subsequent opposition to the Department's summary judgment motion recited, "Andersen's claim, however, is not a hostile work environment [claim] based upon sex or gender.  Andersen's claim is a disability discrimination claim with a constructive discharge.  The elements of a disability discrimination claim [are] completely different from a hostile work environment claim."  On appeal, however, Andersen has adopted the court's view

therefore turn to whether Andersen's disability-based claim of a hostile work environment was timely.

## C. The Timeliness of Andersen's Disability-Based Claim of a Hostile Work Environment under the Continuing Violation Doctrine

[¶25]  The statute of limitations for MHRA claims provides, "The action must be commenced not more than either 2 years after the act of unlawful discrimination complained of or 90 days after any of the occurrences listed under [5 M.R.S. § 4622(1)(A)-(D)], whichever is later."  5 M.R.S. § 4613(2)(C); *see also* 5 M.R.S. § 4622(1)(A)-(D) (listing MHRC actions that trigger the ninety-day period).  Here, the ninety-day period was triggered by the MHRC's issuance of a right-to-sue letter on August 19, 2020.  *See* 5 M.R.S. § 4622(1)(C). Because Andersen did not file her complaint until August 18, 2021, it is the later deadline two years after the act complained of that governs the timeliness of her claim.  To avoid summary judgment, Andersen needed to make at least a prima facie showing that the Department engaged in actionable disability discrimination on or after August 18, 2019—within the two years before she filed the complaint.

---

of her claim—her brief asserts that "the constructive discharge is part of her underlying claim of discrimination based [upon] a hostile work environment."

[¶26]   Andersen does not dispute the finding in the court's summary judgment order that there were only two relevant events that occurred on or after that date: (1) the Department's refusal, from August 18 to August 30, 2019, to reassign Andersen as a reasonable accommodation and (2) Andersen's resignation on August 30, 2019.  However, because a claim of a hostile work environment generally requires proof of a series of acts and events that "collectively constitute one unlawful employment practice," *Morgan*, 536 U.S. at 117 (quotation marks omitted), the claim "will not be time-barred merely because a portion of the individual acts that comprise the hostile work environment took place outside" of the statutory period, *Randall*, 366 F. Supp. 2d at 114.  *See also LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 12, 909 A.2d 629 ("[C]laims arising from a hostile work environment . . . 'cannot be said to occur on any particular day.'" (quoting *Morgan*, 536 U.S. at 115)).  Because Andersen frames her discrimination claim as one involving a hostile work environment, we must consider whether Andersen has made a prima facie showing that either of the two events that occurred within the statutory period is sufficiently connected to earlier events to be deemed a continued manifestation of a hostile work environment and therefore actionable as a continuing violation.  *See Morgan*, 536 U.S. at 116-21.

18

[¶27]  Under *Morgan*'s articulation of the continuing violation doctrine, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory period." *Id.* at 120.  Whether an individual event can constitute part of a continuing violation depends on three factors: "1) whether the within and without statute of limitations harassment involve the 'same type of employment actions'; 2) whether they occurred 'relatively frequently'; and 3) whether they were 'perpetrated by the same managers.'"  *Randall*, 366 F. Supp. 2d at 116 (quoting *Morgan*, 536 U.S. at 120).

[¶28]  Applying the *Morgan* test, and viewing the statements of material facts in the light most favorable to Andersen, we conclude that Andersen has not made a prima facie showing that either the Department's refusal to reassign her or her resignation is part of a continuing violation under the *Morgan* factors. Andersen acknowledges in her reply brief that the Department's refusal to reassign her is not evidence of a continuing violation.  Andersen maintains, however, that because her resignation on August 30, 2019, was a constructive discharge, it qualified as an act that is part of the pattern of harassment constituting the hostile work environment.  We disagree.

[¶29] Andersen's resignation was too disconnected from the circumstances that she alleges constituted a hostile workplace environment to qualify as a constructive discharge, and it therefore could not constitute part of a continuing violation under the *Morgan* factors. She had been away from the work environment for more than seven months when she resigned.[7] "If a plaintiff does not resign within a reasonable time period after the alleged harassment, [s]he was not constructively discharged." *Landrau-Romero v. Banco Popular de P.R.*, 212 F.3d 607, 612-13 (1st Cir. 2000) (affirming summary judgment on a constructive discharge claim when the employee quit seven months after the last alleged discriminatory act); *see Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (holding that an employee who resigned six months after the last alleged act of discrimination was not constructively discharged). Moreover, "[i]n order for a resignation to constitute a constructive discharge, it must be 'void of choice or free will—[the] only option was to quit.'" *Sullivan v. St. Joseph's Rehab. & Residence*, 2016 ME 107,

---

[7] Andersen relies on the First Circuit decision in *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002), but the facts there are distinguishable. One difference is that the employee in *Marrero* filed her initial discrimination claim before resigning her position. *Id.* at 15-16. The timeliness issue in *Marrero* was whether the employee could recover for acts of discrimination outside the limitations period. *Id.* at 17. Two more differences between *Marrero* and this case are that, in *Marrero*, the employee alleged that actual acts of sexual harassment had occurred within the limitations period and the employer "did not dispute that [the employee's] allegations of sexual harassment [within the limitations period], if true, would satisfy the relatedness requirement of the continuing violation doctrine" under *Morgan*. *Id.* at 17-18.

¶ 21, 143 A.3d 1283 (quoting *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014)).  Here, the Department did not require Andersen to decide between resigning or returning to work.  The Department also did not refuse to accommodate Andersen's disability; it denied the specific accommodation she had requested—an accommodation she acknowledges the Department was not required to offer her.

[¶30]  For these reasons, we agree with the trial court that neither of the two relevant events that occurred within the statute of limitations could suffice as prima facie evidence of a continuing violation.  The court was justified in concluding that Andersen had not met her burden to show that there was a genuine issue of fact as to whether her claim of a hostile workplace environment was time-barred.

The entry is:

Judgment affirmed.

---

Guy D. Loranger, Esq., Law Office of Guy D. Loranger, Old Orchard Beach, and Danielle Quinlan, Esq. (orally), White & Quinlan, LLC, Kennebunk, for appellant Sharon Andersen

Aaron M. Frey, Attorney General, and Jeremy C. Carter, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Cumberland County Superior Court docket number CV-2021-319
FOR CLERK REFERENCE ONLY